THOMPSON, J.
 

 The plaintiff leased to the defendant Williams her Cottage Plantation on the Mississippi river below the city of Baton Rouge.
 

 The term of the lease was three years, beginning January 1, 1920, and ending December 31, 1922. The price of the lease was $3,000 for the first year and $3,500 for each of the other years, for which Williams ex
 
 *433
 
 ecuted his notes, payable on November 1 of each year of the lease.
 

 The first note was paid, but default was made on the second note, and this suit was filed thereon against Williams.
 

 A writ of provisional seizure was issued, and some 400 head of cattle then in the pasture on the leased premises were seized.
 

 Robinson and MeVay by way of third opposition claimed to be the owners of the cattle, free from any lessor’s privilege in favor of plaintiff for the rent due by Williams.
 

 It is contended that the cattle were placed on the leased plantation under a contract with Williams, the lessee, by which the said cattle were to be kept and grazed on the pasture until sold by the said Robinson and MeVay, and that when sold the said Williams was to receive one-half of the net profits that might be realized from the sale; that this agreement constituted a sublease of a part of said plantation; that opponents were not indebted to the lessee Williams except to the extent of 'an eventual one-half interest in the profits derived from the sale of the cattle; and that the said cattle did not fall under a lessor’s privilege in favor of the plaintiff.
 

 It is contended, secondly, that, after making said contract with Williams and before placing the cattle on the leased premises, opponents consulted Mrs. Bailey, the lessor, and fully informed ,her of the contract with Williams, and that she agreed that she would not make any claim or' attempt to assert any lien or privilege on said cattle for her rent.
 

 It is alleged in the petition of opposition that the seizure of said cattle was illegal, arbitrary, unjust, and in bad • faith, and has resulted in actual damage to opponents in the sum of $700 attorney fees and $300 for trouble, expense, costs, and loss of time in opposing the seizure of said cattle and obtaining their release.
 

 In answer to the opposition, the plaintiff denied that she had made, or that she had authorized any one for her to make, any agreement by which she waived her rights as lessor on the cattle, and she further denied that the contract between Williams, her lessee, and Robinson and MeVay, under which the cattle were put on her plantation, amounted in law to a sublease or a subletting and hiring of any part of her said plantation.
 

 She asserted and reaffirmed that said cattle were subject to the lessor’s privilege 'accorded her by law.
 

 The trial judge rejected the demands of the opponents and recognized the lessor’s privilege in favor of the plaintiff.
 

 If either one of the two contentions made by opponents is well founded in law or sustained in fact, the cattle are not subject to the lessor’s privilege.
 

 We shall therefore consider first the second ground urged by opponents.
 

 There is no dispute as to the terms of the contract entered into between Williams and Robinson and MeVay. And we take it to be established beyond controversy that, when Robinson and MeVay put the cattle on the plantation, they were fully justified in assuming and believing that no claim or privilege would be made by'plaintiff against the said cattle.
 

 It is shown that when the contract was made with Williams by Robinson and MeVay, or shortly thereafter, Robinson and MeVay knew or were advised that the plaintiff's rent would be due in a short time. They were likewise informed that in all probability Williams would not be able to pay said rent in full when due.
 

 In order to ascertain their legal rights and to protect their cattle against any possible claim for this rent, Robinson and MeVay consulted an attorney, who advised them to secure a waiver or release from the lessor. Acting on such advice, MeVay in company with Williams called on Mr. Bailey, plain
 
 *435
 
 tiff’s husband, and informed him of the agreement with Williams and of his desire to secure an agreement to the effect that the cattle would not be held for the rent, if placed on the plantation under the agreement with Williams. Mr. Bailey was distinctly informed that, if such a release was not made, the contract with Williams would be canceled and the cattle would not go on the plantation. The matter of Williams’ rent was discussed between Williams and Bailey, and, at the suggestion of Mr. Bailey, Williams promised that he would try and thought that he could pay one-half of the rent on November 15 and the other half on January 1. Williams did not say that he would or could pay on the dates named, but that he thought he could do so. It is not pretended that McVay agreed to see that the rent was paid, nor is it contended — or could it be contended — under the evidence, that the payment of the rent by Williams was made a condition upon which no claim would be asserted against -the cattle. Such a contingency or condition would have been of no benefit to McVay and utterly foreign to the purpose and object of his visit to Mr. Bailey. The sole object of McVay in calling on Mr. Bailey was to get an agreement that the cattle under no circumstances would be held liable if put on the place, and this was so declared to Mr. Bailey.
 

 In the conversation referred to, Mr. Bailey informed McVay that he did not own the place and had no authority in the matter; but on his own volition and without any suggestion from McVay said that he would take the matter up with Mrs. Bailey, which he did over the phone. Precisely what was said by Mrs. Bailey in this talk with her husband is a matter of controversy between the other witnesses and herself. The fact remains, however, that, whatever might have oeen said by Mrs. Bailey to her husband, it was deemed sufficient by Mr. Bailey to authorize him to tell McVay and Williams to go ahead and put the cattle on the place; that it was not necessary to get a written release from Mrs. Bailey; and that he did not think the cattle would be liable for the rent. With this understanding, McVay went away satisfied and placed the cattle on the plantation.
 

 It is quite true that Mrs. Bailey and Mr. Bailey both say that Mrs. Bailey did not consent to waive or to relinquish any claim she might have on the cattle, if they were put on the plantation. But the statements amount at most to nothing more than their interpretation and their opinion as to the effect of what was said or done. It is for the court to determine the legal effect and force of the words used, and not for the witnesses or the parties themselves.
 

 We shall not go into all the evidence in detail of this phone conversation between Mr. Bailey and his wife. It is sufficient to support the conclusion we have reached to refer briefly to only a portion of Mr. and Mrs. Bailey’s testimony.
 

 It must be remembered that the sole object of Mr. McVay was to get the release, and the sole object of Mr. Bailey in calling his wife on the phone was to inform her of this fact and to get her consent thereto. Mrs. Bailey admits this. She does not remember exactly what was said and all that was said by her, but the thought dominating her mind was that she wanted her rent and did not want tq|>do anything that would interfere with collecting her rent. She says that she did not tell Mr. Bailey that she would or would not waive her rent claim on the cattle, if they were put on the place. She admits that Mr. Bailey told .her that Williams would pay half on the 15th of November and the other half on January 1st. That she told Mr. Bailey:
 

 “All I am interested in is getting my rent, and, if they pay me half on November 15th and the other half on January 1st, I have no further interest in it. That was my answer to Mr. Bailey, and I have never changed it, be
 
 *437
 
 cause aE I wanted was my rent. I did not agree to waive any rent or anything else through Mr. BaEey with these other gentlemen.”
 

 It is very clear that Mrs. Bailey at no time gave Mr. Bailey to understand that she expected to hold the cattle, if Williams did not pay his rent. If she had done so, the fact would certainly have been communicated by Mr. Bailey to McVay, and the cattle would not have been put on the place. The attitude of Mrs. Bailey, plainly evident from her testimony, is that she did not want to do anything that would interfere with collecting her rent, and that she neither consented to nor refused the request made by McVay through Mr. Bailey, but left the matter with him.
 

 Now, what does Mr. Bailey say? He says that he told Mrs. Bailey that putting the cattle on the place would not interfere with .her collecting her rent. That putting the cattle on the place under the agreement by which Williams would share in the profits when the cattle were sold would materially aid Williams in paying the rent. That he could make some money out of the cattle in addition to the money that he would make on the place. We quote some of Mr. Bailey’s testimony.
 

 “Q. Now, is it not a fact that you talked over with these gentlemen the desirability from the standpoint of Mrs. Bailey as the owner of the land of allowing these people to put these cattle on there, in order to enable Mr. AVilliams to make some money out of which he could pay the rent?
 

 “A. Yes, sir; and I took the position that Mr. AVilliams — that it would help Mr. AVilliams; that he could make some money out of the cattle in addition to the money that he could make on the place.
 

 “Q. And you repeated that view of it to Mrs. Bailey ?
 

 “A. Why, certainly.
 

 “Q. And she said that, if it did not interfere with the collection of her rent, that it would be all right and that whatever you saw fit to do about it would be all right, didn’t she?
 

 “A. Based on what I told her over the phone; yes, sir.
 

 “Q. And what you told her over the phone was that Mr. Williams agreed to pay one-half of the rent on November 15 and one-half on January 1, if he could, and that he thought he could?
 

 “A. Yes, sir.”
 

 We quote also from Mr. Bailey’s evidence on page 71:
 

 “Q. You heard Mr. MeA’ay’s statement that he heard Mrs. Bailey’s statements over the telephone, as well as yours, and that she said she would turn the whole matter over to you for you to use your judgment. Now, did Mrs. Bailey or not turn the matter over to you and give you the right to do as you saw fit in the matter ?
 

 “A. Mrs. Bailey did say that if they would do what I told her they would do it would be all right.
 

 “Q. Now, what did you tell Mrs. Bailey you would require them to do?
 

 “A. Well, I told Mrs. Bailey — I told them that Mrs. Bailey agreed if Mr. Williams would agree to pay half of the rent on the 15th of November and the other half on the first of January, that it would be all right; and that is what I said over the telephone.
 

 “Q. You told Mrs. Bailey that?
 

 “A. Yes, sir.
 

 “Q. After you made that statement to her over the telephone, what did she say?
 

 “A. Well, it was ended; she said it would be all right, or words to that effect — to go ahead.”
 

 It is quite obvious from Mr. Bailey’s testimony, without taking into consideration that of McVay and Williams, that on the statement of Williams that he would try to pay and thought that he could pay his rent at the time and in the manner stated, and which fact was told Mrs. Bailey, she authorized Mr. Bailey to go ahead and do what he thought best. In these circumstances Mr. Bailey did agree that Mr. McVay could put his cattle to graze on the pasture, and that the said cattle would not he subject to the rent claim.
 

 It would be palpably inequitable and unfair to enforce the lessor’s privilege on the cattle under the circumstances and condi- ' tions herein stated.
 

 
 *439
 
 This conclusion makes it unnecessary to determine the question as to whether the contract between Robinson and McVay was or was not a sublease.
 

 The opponents have asked for damages on account of the seizure of their cattle. They are clearly entitled to attorney fees.
 

 Where property belonging to a third person is illegally seized and the owner is forced to go into court to obtain the release of the seizure, he is entitled to attorney fees as damages. Soniat v. Whitmer, 141 La. 236, 74 So. 916; Ludeling v. Garrett, 50 La. Ann. 118, 23 So. 94. Commission Co. v. Yale, 47 La. Ann. 690, 17 So. 244.
 

 We shall fix the attorney fees at $250. All other claims for damages are disallowed.
 

 The judgment appealed from is reversed and set aside, and it is now ordered that the provisional seizure be released and dissolved, and that the opponents have judgment against the plaintiff for $250 as attorney fees; all costs to' be paid by plaintiff.
 

 BRUNOT, X, recused.